UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:04CR461RWS(MLM) |
| | ) | |
| CHEYANNE LEE ACOSTA, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the court on the pretrial motions of the parties. This case is set for trial before the Honorable Rodney W. Sippel on **June 13, 2005** at **9:00 A.M.**

**1.    Defendant's Motion to Dismiss the Indictment [Doc. 134]**

This is a seven person Indictment in which defendant, Cheyanne Acosta, is charged in Count I with Conspiracy (beginning approximately January 1, 2004 to the date of the Indictment) to possess at least 100 grams but less than 300 grams of pseudoephedrine knowing and having reasonable cause to believe it would be used to manufacture methamphetamine.

Defendant has moved to dismiss the indictment on grounds that it is vague, uncertain, indefinite, ambiguous and duplicitous, that it does not contain a plain, concise and definite statement of the essential facts constituting the offense charged, and that it fails to inform the defendant of the nature of the charges against him. He further alleges that the indictment fails to allege sufficient facts to constitute an offense against the constitution or laws of the United States. In addition to allegations that the indictment was based on insufficient competent evidence having been presented to the grand jury, defendant alleges that the indictment charges him under laws which are illegal, void and unconstitutional as applied to defendant.

To be legally sufficient on its face, the indictment must contain all the essential elements of the offense charged, it must fairly inform the defendant of the charge against which the defendant must defend, and it must allege sufficient information to allow the defendant to plead a conviction

or an acquittal as a bar to a subsequent prosecution. United States Const. Amends. V and VI; Fed.R.Crim.P. 7(c); Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. Just, 74 F.3d 902, 903-04 (8th Cir. 1996); United States v. Wessels, 12 F.3d 746, 750 (8th Cir. 1993), cert. denied, 513 U.S. 831, (1994); United States v. Young, 618 F.2d 1281, 1286 (8th Cir.), cert. denied, 449 U.S. 844 (1980). The Indictment in this case sets out all of the elements of the crime charged.

The defendant alleges that the indictment was returned on the basis of insufficient and/or incompetent evidence. An indictment valid on its face is immune from attack by a claim that there was insufficient competent evidence presented to the grand jury. United States v. Calandra, 414 U.S. 338, 349-52 (1974); Costello v. United States, 350 U.S. 359, 363-64 (1956).

An indictment may be based in whole or in part on hearsay evidence, Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395 (1959); United States v. Bednar, 728 F.2d 1043, 1049 (8th Cir.), cert. denied, 469 U.S. 827 (1984). The government states that no illegally seized evidence was presented to the grand jury in the present case, however, even if it had been, the indictment would not be rendered invalid by such evidence. United States v. Calandra, 414 U.S. 338, 354 (presentation of inadmissible evidence to grand jury involves no independent or new violation of the Fourth Amendment); United States v. Levine, 700 F.2d 1176, 1179 (8th Cir. 1983) (the exclusionary rule does not prohibit illegally seized evidence from being considered by a grand jury).

This indictment is a plain, concise and definite statement of the essential facts constituting the offense charged and complies in all respects with Rule 7 of the Federal Rules of Criminal Procedure. It tracks the language of the statute and places the defendant on notice of the nature and extent of the charges in order to protect him from double jeopardy. See Hamling, 418 U.S. at 117; Young, 618 F.2d at 1286. This Indictment should not be dismissed.

**2.     The Government's Motion for a Pretrial Determination of the Admissibility of Defendant's Statements Pursuant to Title 18 United States Code § 3501  [Doc. 27]**

**and**

**3.     Defendant's Motion to Suppress Evidence and Statements  [Doc. 135]**

On April 12, 2005 an Evidentiary Hearing was held regarding defendant Acosta. Following the Hearing, the parties requested and were granted an opportunity to file post-hearing briefs. Defendant filed a Memorandum in Support of his Motion to Suppress Evidence and Statements [Doc. 167], the government responded [Doc. 172] and defendant Acosta replied [Doc. 175]. At the Hearing the parties stipulated the court could consider the evidence adduced at the two previous Evidentiary Hearings held in this case on October 13, 2004 (re: co-defendants Christopher Decker and Kelly Graddy) and November 9, 2004 (re: co-defendant John Osick). At the October 13, 2004 Hearing, the government presented the testimony of nine witnesses, only one of which, Detective Corporal Jason J. Grellner, is relevant to defendant Acosta. At the November 9, 2004 and April 12, 2005 Hearings, the government again presented the testimony of Detective Grellner who is with the Franklin County Sheriff's Department and who has been in charge of the Narcotics Unit for three years. Based on the testimony and evidence adduced at the 10/13/04, 11/9/04 and 4/12/05 Hearings and having had an opportunity to evaluate the credibility and observe the demeanor of the witnesses, the undersigned makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

John Wall is a St. Louis County Police Officer assigned to the Bureau of Drug Enforcement. On 3/30/04 he arrested Charlyne Graddy and Christina Massa in possession of more than 1,500 pseudoephedrine pills, used in the manufacture of methamphetamine. They agreed to cooperate with the officers and gave taped statements. They also agreed to make a controlled delivery. Graddy said the pills were to go to her mother, [co-defendant] Kelly Graddy and John Graham who

---

[1]     Although the court has submitted two previous R&Rs containing most of the facts surrounding the Arapahoe Campgrounds, those facts will be repeated here and supplemented with the 4/12/05 testimony for the convenience of the trial court.

were at the Arapaho Campgrounds in Franklin County. Charlyne Graddy said her car needed repair and her mother had had it repaired for her and as payment, Charlyne Graddy was to purchase pseudoephedrine for cooking into methamphetamine. Charlyne Graddy said her mother was holding her vehicle "hostage." Det. Jason Grellner of the Franklin County Sheriff's Department interviewed the two women. For a while, Charlyne Graddy maintained the pills were for her mother and her mother's friend to be converted into methamphetamine. Later, after she received between five and eight cell phone calls, she changed her story and said the pills were to be delivered to [co-defendants] Patrick Dougherty and Chris Decker. She spoke first to Daugherty, later to Decker. Det. Grellner heard Charlyne Graddy's side of the conversation and directed her to arrange to hand over the pills at a market inside the city limits of Sullivan, Missouri. At first, the two men were willing to meet there but later they expressed reluctance because they had outstanding warrants and feared they would be arrested in Sullivan. They agreed to make the transfer at a motel in Stanton where the women would rent a room.

The officers and the two women went to the Delta Motel in Stanton and the women attempted to rent a room. Just as they were negotiating the rental, the officers received radio notification that Sullivan Police Officers were in pursuit of the vehicle occupied by Dougherty and Decker. At that point the two women were taken to the Sullivan Police Department for further questioning.

Charlyne Graddy told Det. Grellner that the pills were to have been taken to the Arapaho Campgrounds for conversion into methamphetamine. She said her mother, her mother's cousin, [co-defendant] John Osick, and a person she knew as Cheyanne [co-defendant Acosta] were staying at the campgrounds. She said they had to use knives to jimmy the locks on the doors of the cabins. She said Decker, Mr. Graham, her mom, defendant Acosta and Dougherty and others had been manufacturing methamphetamine at the campgrounds on various occasions. After the controlled delivery failed and based on the information they had received from Charlyne Graddy and Christina

Massa, the officers decided to go to the campgrounds to investigate burglary, trespassing and possible narcotics manufacture. Officers from various departments responded.[2]

Det. Grellner had previously received reports from an unknown confidential source regarding possible manufacture of methamphetamine by Christopher Decker at the Arapaho Campgrounds but the reports were somewhat vague and had not been acted upon. He had also been to the campgrounds before to return a stolen canoe.

The officers arrived and parked at the gate. A vehicle they recognized from the description given by Charlyne Graddy as being Kelly Graddy's vehicle was parked outside the gate, indicating she did not have keys to the gate. They climbed over the gate or went around it by the path on the side and went to the larger cabin where they observed a light flickering as if from a television set. As they approached the main entry door of the screened in porch of the cabin, they observed sitting on a picnic table on the porch, a clear glass Mason jar containing clear liquid with a strong chemical odor and some powder and paper filters, all of which are associated with the manufacture of methamphetamine. They also saw a thirty gallon plastic trash can on the deck with no lid. In the can they observed starting fluid cans which contained ether and a propane cylinder which had been altered so that it could contain anhydrous ammonia. Based on his extensive experience, Det. Grellner testified at length how each of the items located are used in the manufacture of methamphetamine.

Based on what they observed they decided to attempt to enter the large cabin. They crossed the screened porch and knocked on the slightly ajar door of the cabin and announced they were with the Sheriff's Department. They observed directly across the room defendant Cheyanne Acosta lying

---

[2] The Arapahoe Campgrounds is a canoe rental place. During the summer it is an extremely active area. They have rentals for canoe floats along the Meramec River. The area is bounded by the river on one side, hills on two sides and a fence with a gate on the other. There may be a small path through the fence and to the side of the gate. To the left after one enters the gate is the canoe rental area as well as a food stand and then to the right are extremely small cabins which are rented out for sleeping cabins as well as a larger cabin with a deck and a screened in porch area which can also be rented during the summertime.

on the couch. He appeared groggy as if sleeping. Det. Grellner told defendant Acosta he needed to speak with him. He asked defendant if he had permission to be there and defendant replied that he had permission from his friend, Rigel.[3] He did not know Rigel's last name. He said he did not pay rent or lease the cabin. Det. Grellner told defendant Acosta of the items they had located so far. Det. Grellner asked defendant for consent to search. He did not present defendant with a consent to search form. He told defendant he did not know if defendant had a right to privacy but he would let defendant decide. Defendant consented to the search, was present throughout and did not object in any way. Defendant said he was living with Rigel and Rigel's girlfriend and was not sure what all was there. Det. Grellner said the officers would show defendant what they discovered and he could say whether it was his or not. Defendant stated Rigel was in rehab and Rigel's girlfriend was in prison on a methamphetamine charge. Defendant said he did not who was the owner of the property.

The officers searched the cabin and located a "party tray" with aluminum foil used in the consumption of methamphetamine; heroin in a rear bedroom; a white powder on a plate in a small loft and an empty HEAT brand container, used in the manufacture of methamphetamine. They also found small zip lock bags for packaging, hot glue and twisters used in the final stages of methamphetamine manufacture, along with a scale for weighing. All the items were seized as well as other items related to the manufacture of methamphetamine.

Det. Grellner had no further conversation with defendant Acosta that night. Other officers searched the other cabins and located two of the co-defendants (John Osick and Kelly Graddy) and numerous items related to the manufacture of methamphetamine. Det. Grellner considered the cabins and campground to comprise a methamphetamine laboratory. Defendant Acosta was arrested and taken to the Franklin County Sheriff's Department. He had no keys in his possession when he was arrested nor were any keys located during the search. The officers went home and

---

[3] It was later learned that Rigel is Rigel Capin, the winter custodian who had been in rehab for one and a half months at the time of this incident.

slept. The next day Det. Grellner interviewed defendant Acosta in the interview room at the Sheriff's Department. Only defendant and Det. Grellner were present. Det. Grellner advised defendant of his Miranda rights by reading from the Sheriff's Department Miranda card. He told him in effect that he had the right to remain silent; that anything he said could be used against him in court; that he had the right to talk to a lawyer for advice before they asked him any questions; that he had the right to have a lawyer with him during questioning; that if he could not afford a lawyer, one would be appointed for him before any questioning; and that if he decided to answer questions now without a lawyer present he had the right to stop answering at any time. Defendant said he understood his rights and agreed to speak to Det. Grellner. Defendant appeared awake and lucid. He was able to follow what Det. Grellner said and he responded appropriately to questions.

Det. Grellner asked defendant how he came to be at the campgrounds. Defendant again said he had been staying for some time with Rigel and Rigel's girlfriend. He said he previously had had no place to stay and actually lived in the woods. He said after he moved in, people came and manufactured methamphetamine. Det. Grellner asked defendant if he used methamphetamine and defendant responded that he had sampled every drug known to man. He said he used methamphetamine extensively after he moved into the campgrounds. After Rigel left, people again came to manufacture methamphetamine. Defendant said because he had no job and no money he let them in and they manufactured for free. Defendant said he smoked the leftovers. Det. Grellner asked defendant about the others who were arrested and defendant indicated knowledge of Kelly Graddy, John Osick, "Billy", Chris Decker and Duke West.

Det. Grellner eventually contacted the owner of the campgrounds. The owner said the only person who had permission to be at the campgrounds was Rigel Capin. The owner was not aware that the other cabins were being used. He was not aware that Rigel Capin was in rehab. The owner wanted all persons found at the campground arrested for trespassing and gave Det. Grellner permission to seize all the methamphetamine-related materials and paraphernalia.

## CONCLUSION OF LAW

Defendant asserts standing[4] to challenge the search of the cabin and its curtilage at the Arapaho Campgrounds on the ground that he had a reasonable expectation of privacy. [Doc. 167] The government's Response disputes defendant's contention and argues that he had neither a subjective nor an objective expectation of privacy. [Doc. 172] Defendant replied to the government's Response. [Doc. 175]

1.  **The Cabin**

    The defendant lacks standing to challenge the search. Fourth Amendment rights may not be asserted vicariously and thus it must be determined whether the defendant had a legitimate expectation of privacy in the area searched. <u>United States v. Gomez</u>, 16 F.3d 254, 256 (8th Cir. 1994), <u>citing</u> <u>Rakas v. Illinois</u>, 439 U.S. 128, 138-44 (1978). The defendant has the burden of proof on the issue of his reasonable expectation of privacy. <u>United States v. Kiser</u>, 948 F.2d 418, 423 (8th Cir. 1991), <u>cert. denied</u>, 112 S.Ct. 1666 (1992). If a defendant cannot prove a sufficiently close connection to the object or place searched, he has no standing to claim the search was illegal. <u>United States v. Sanchez</u>, 943 F.2d 110, 113 (1st Cir. 1991). The Eighth Circuit in <u>Gomez</u>, 16 F.3d at 256, has cited with approval a seven-part test for determining standing:

    > Ownership, possession and/or control of the area searched or items seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or non-existence of a subjective

---

[4] As pointed out in <u>United States v. Sanchez</u>, 943 F.2d 110, 113 n.1 (1st Cir. 1991), the use of the word "standing" is convenient but somewhat imprecise. The Supreme Court has indicated in <u>Rakas v. Illinois</u>, 439 U.S. 128 (1978), that matters of standing in the context of searches and seizures actually involve substantive Fourth Amendment law. <u>See</u> <u>also</u> <u>Minnesota v. Carter</u>, 525 U.S. 83, 119 S.Ct. 469, 472 (1998)("in determining whether a defendant is able to show a violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'"<u>quoting</u> <u>Rakas</u>.) Standing is not to be analyzed apart from the merits, rather a defendant is required to prove a legitimate expectation of privacy as a prerequisite to challenge unlawful police conduct. <u>Sanchez</u>, 943 F.2d at 113 n.1.

anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case. Sanchez, 943 F.2d at 113.

Applying this test to the present case, it is clear that defendant Acosta did not have ownership of the cabin or its curtilage. He had however resided in the cabin for some period of time. His ability to regulate access is unclear however he stated that he let people in to manufacture methamphetamine. However, only Rigel Capin had been given keys to the cabin and there is no evidence he gave the keys to defendant Acosta. The evidence only supports the fact that defendant did not have keys on his person when arrested nor were any keys found during the search. Information from Charlyne Graddy was that they had used knives to jimmy the locks.

The totality of the circumstances surrounding the search are set out in the Findings of Fact above. Det. Grellner testified he had probable cause to believe that methamphetamine was being manufactured at the campgrounds.[5] This is a valid conclusion based on the information from the Confidential Informant and from Charlyne Graddy and Christina Massa.

Defendant Acosta argues he had a subjective expectation of privacy because Rigel, the winter custodian, told him he could stay there. Defendant was effectively "crashing" at Rigel's place. It is to be noted that he did not know Rigel's last name and he did not pay rent. The evidence about his possession of keys is unclear. When Rigel left to go into rehab, defendant Acosta merely stayed on. Even if one assumes he had a subjective expectation of privacy it is not one that a reasonable person would find objectively reasonable. He knew there was illegal activity going on as he made clear in his statement. See State of Iowa v. Baker, 441 N.W.2d 388, 390 (1989).

> A "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar applying his trade in a summer cabin

---

[5] Defendant Acosta repeatedly says in his post-hearing briefs that there was no reason to believe that methamphetamine was being manufactured that night because the pills had been seized. This argument is without merit. There is no need for the manufacture to actually be taking place when the officers arrived. It is sufficient that they had a reasonable belief based on all the information available to them at that time that the manufacture of methamphetamine was taking place at the campgrounds on an ongoing basis. Their experience in the field of methamphetamine manufacture led them to conclude that the indices of the manufacture would be present.

> in the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence,...is "wrongful"; his expectation is not "one that society is prepared to recognize as reasonable."

Baker, 441 N.W.2d at 390 citing Rakus v. Illinois, 439 U.S. 128, 143-44 (1978). Here, defendant Acosta was present in the Arapaho Campgrounds with full knowledge that criminal conduct was going on. He said that after he moved in people came to manufacture methamphetamine and after Rigel Capin left for rehab defendant Acosta himself permitted the methamphetamine cooks to manufacture on the premises and he smoked the leftovers. The court finds that defendant Acosta did not have a legitimate expectation of privacy in the cabin and thus does not have standing to challenge the search.

In the alternative, even if the trial court should find that defendant Acosta did have a legitimate expectation of privacy, he consented to the search. When the officers arrived and knocked on the cabin door, defendant Acosta waived them in and voluntarily consented to the search. A search based on the consent of an individual may be undertaken by government actors without a warrant or probable cause and any evidence discovered during the search may be seized and admitted at trial. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). Consent must be freely and voluntarily given. Id. In determining whether consent is freely and voluntarily given, the court must examine the totality of the circumstances. United States v. Mendenhall, 446 U.S. 544, 547 (1980); United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990); United States v. Lee, 886 F.2d 998, 1000 (8th Cir. 1989), cert. denied, 495 U.S. 906 (1990).

Under the totality of the circumstances, defendant Acosta voluntarily consented to the search. He said he did not know what all was there because he had been living with Rigel and Rigel's girlfriend and Det. Grellner even told him he could say which items they located were his. The items found in the cabin, on the porch and by the steps should not be suppressed.

2. **The Curtilage**

**Defendant also argues that he had a reasonable expectation of privacy in the curtilage around the cabin. It is undisputed that the property is bounded by the river, hillsides on two sides and a fence with a gate which apparently was locked. It is not clear whether there is a path leading around the gate. Det. Gellner testified he either climbed over the gate or went around it. The campground was closed for the winter and not open to the public at that time. The officers entered the campgrounds without consent. The cabin in which defendant was located is approximately 100 to 200 feet from the gate. Defendant's cabin was the largest cabin and there were several smaller ones, two of which were occupied by co-defendants John Osick and Kelly Graddy.**

"The Fourth Amendment protects people from unreasonable searches of their home and buildings within the home's curtilage." United States v. Mooring, 137 F.3d 595, 596 (8th Cir. 1998); see United States v. Dunn, 480 U.S. 294, 300-04 (1987). The Fourth Amendment protection extends beyond the threshold of the residence and protects, as well, areas surrounding the home in which is carried on the "intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" Oliver v. United States, 466 U.S. 170, 180 (1984) (quoting Boyd v. United States, 116 U.S. 616, 630 (1886)). This area surrounding the home is referred to as the "curtilage." In Dunn, 480 U.S. at 301, the Supreme Court set out a number of factors to be considered in determining whether an area in question is within the curtilage including the proximity of the area to the home; whether the area is included within an enclosure surrounding the home; the nature of the uses to which the area is put; and the steps taken by the resident to protect the area from observation by people passing by. Id. at 301. These factors are not to be applied mechanically but are to be used in determining the extent to which the area is associated with the home in determining whether it should be afforded the same Fourth Amendment protection. Id. "[w]hether an area is within a house's curtilage depends not only on proximity to the house but also on the *use of the area and efforts to shield* it from public view and access as well as the nature for which it is used. United States v. French, 291 F.3d 945, 951 (7th Cir. 2002) quoting Dunn, 480 U.S. at 302-03. (emphasis in original.)

- 11 -

Police however may enter a defendant's property to observe buildings and areas located outside the home's curtilage. United States v. Gerard, 362 F.3d 484, 487 (8th Cir.), cert. denied, 125 S.Ct. 311 (2004); Mooring, 137 F.3d at 596. In addition, "law enforcement officers may encroach upon the curtilage of a home for the purposes of asking questions of the occupants." United States v. Hammett, 236 F.3d 1054, 1059 (9th Cir.); cert. denied, 534 U.S. 866 (2001); United States v. Raines, 243 F.3d 419, 421 (8th Cir. 2001). See also United States v. Reyes, 283 F.3d 446, 466 (2nd Cir. 2002) (No Fourth Amendment violation when officer entered on driveway across which chain stretched to prevent vehicle access, but no signs forbidding pedestrian access.) It may be unnecessary to reach the question of whether the area between the gate and the cabin are within the curtilage, however, for defendant Acosta's argument fails for another reason. Primarily, defendant has failed to show he had a legitimate expectation of privacy in the campground. While the government bears the burden to demonstrate an exception to the warrant requirement where police conduct a warrantless search of a residence and areas within the residence's curtilage, the defendant first bears the burden to demonstrate that he has a legitimate expectation of privacy in the area searched. Florida v. Riley, 488 U.S. 445, 455 (1989) (O'Connor, J., concurring); United States v. Mendoza, 281 F.3d 712, 715 (8th Cir. 2002). That burden is met by showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept." Mendoza, 281 F.3d at 715 (quoting United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999)); see Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

The case law recognizes that "tenants of multifamily dwellings have no legitimate expectation of privacy in common or shared areas." Mendoza, 281 F.3d at 715. Thus, in Mendoza the Eighth Circuit found that defendant had no privacy interest in the vestibule of a duplex where the outer door was not secured, the area contained two mail boxes and defendant had done nothing to lead the officers to believe he had a protectable interest in the area. Id. Accord McCaster, 193 F.3d 930, 933 (no legitimate expectation of privacy in hallway closet of duplex); United States v.

McGrane, 746 F.2d 632, 634 (8th Cir. 1999) (no legitimate expectation of privacy in basement storage locker in multifamily dwelling to which others have access); United States v. Luschen, 614 F.2d 1164, 1173 (8th Cir.) (no reasonable expectation of privacy in second floor landing of apartment building even though it was a "security building" which officer could enter only by getting a key from the manager), cert. denied, 446 U.S. 939 (1980); United States v. Eisler, 567 F.2d 814, 816 (8th Cir. 1977) ( no legitimate expectation of privacy in apartment hallway where conversation took place). This has been found to be so even if officers "trespassed" to gain entry to the area. United States v. Nohara, 3 F.3d 1239, 1242 (9th Cir. 1993); McGrane, 746 F.2d at 634; Eisler, 567 F.2d at 816.

      Here it is undisputed that the co-defendants present at the campgrounds had equal access to the common areas of the campground and to the smaller cabins. The co-defendants were sleeping in the smaller cabins and used the other areas together with others named by defendant Acosta for the manufacture of methamphetamine. They regularly use the path/walk from the gate to get to the cabins. To the extent the gate was locked, it only prevented vehicular traffic and there is no evidence that pedestrians were excluded. See Reyes, 283 F.3d at 466 (no Fourth Amendment violation when officer entered on driveway across which chain stretched to prevent vehicle access, but no sign forbidding pedestrian access); see also Braden v. County of Lake, 2001 WL 1485828 (9th. Cir. Cal.) (area from which vehicles were seized was not within curtilage of vehicle owner's home where most of the property was shielded by barbed wire fence through which public could easily see, and thus fence may have been intended to keep out trespassers or control cattle not shield property from public view).

      Based on the foregoing it is clear that defendant Acosta had no privacy interest in the campgrounds. The police had information from a confidential informant about the manufacture of methamphetamine as well as the information from Charlyne Graddy and Christina Massa that methamphetamine was being manufactured at the campgrounds. The police obviously had a legitimate reason to investigate. They were reasonably justified in crossing the gate, approaching the larger cabin where the light was flickering in order to question the occupants.

Finally, the court finds in any event that the campgrounds were not within the curtilage of the large cabin. The "central component" in determining whether a challenged area is within the curtilage is "whether the area harbors the intimate activity associated with the sanctity of a man's home and privacies of life." Dunn, 480 U.S. at 300; Girard, 362 F.3d at 487. As noted above, the Supreme Court has developed a four factor test to determine curtilage questions; (1) the proximity of the area to the home; (2) whether the area and the house are within the same enclosure; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from being seen by others. Dunn, 480 U.S. at 301; Girard, 462 F.3d at 487. "'[E]very curtilage determination is distinctive and standard falls on its unique set of facts.'" Girard, 362 F.3d at 487 (quoting Daughenbaugh v. City of Tiffin, 150 F.3d 594, 598 (6th Cir. 1998)). The Eighth Circuit has thus recognized that the four factors referenced above "are analytical tools used in determining whether" the area is so tied to the residence itself "that it should be placed under the [residence's] umbrella of Fourth Amendment protection." Id. at 487.

Applying the above test to the facts of this case the court finds that the campgrounds area is not within the curtilage. Two factors do weigh in defendant's favor. The campgrounds are immediately adjacent to the large cabin and the cabin and grounds are within the same enclosure of the river, two hillsides and the gated fence. The third and fourth factors weigh heavily against a finding that the area harbors intimate activities associated with the sanctity of a man's home and privacies of life. Dunn, 480 U.S. at 300. It was a shared area used regularly by the other methamphetamine manufacturers for their illegal activities. See United States v. Soliz, 129 F.3d 499, 502 (9th Cir. 1997), overruled on other grounds, United States v. Johnson, 256 F.3d 895 (9th Cir. 2001) ("we doubt whether, in the absence of evidence of intimate activities, a shared common area in a multi-unit dwelling compound is sufficiently privacy oriented to constitute curtilage."); United States v. Acosta, 961 F.2d 1248, 1257 (3rd Cir. 1992) (apartment back yard shared with others not part of curtilage). No steps were taken to prevent outside observation, to the contrary, the cabin was visible from the gate, there is no evidence that signs were posted either on the gate

or on the fence to keep out the public and the co-defendants and others left their methamphetamine manufacturing paraphernalia about the area, such as the trash can containing the modified propane tanks and the jar containing clear liquid on the porch.

Under these facts the court finds that the campgrounds were not within the curtilage of the cabin and do not fall within the umbrella of the Fourth Amendment. In addition, defendant had no privacy interest in the cabin or the campgrounds and thus cannot challenge the search. None of the items seized should be suppressed.

**3.    Statements**

Defendant Acosta does not address his statements in his post-hearing brief. However, he does challenge their admission in his original boiler plate Motion.

The few statements made by defendant without being advised of his Miranda rights when the officers entered the cabin are admissible because defendant was not in custody at that time. A defendant must be both in custody and interrogated for Miranda to apply. Miranda v. Arizona, 384 U.S. 436 (1966); Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Defendant was not arrested until after the search was completed and the indicia of methamphetamine manufacture were seized. It is clearly permissible to briefly detain an occupant during a search. Michigan v. Summers, 452 U.S. 692 (1981) (holding officers executing a search warrant for contraband have the authority to detain the occupants of the premises while a proper search is conducted); Muehler v. Mena, ___U.S. ___, 125 S.Ct. 1465 (2005) (an officer's authority to detain incident to a search is categorical; it does not pend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure thus detention and handcuffing for the duration of a search is reasonable under Summers). Here, although the search was conducted pursuant to defendant's consent and not a search warrant, the detention was brief, defendant was not restrained, the questions were limited to the scope of the search and although he was not free to leave, he was not in custody for Miranda purposes. His statements made at the cabin should not be suppressed.

Defendant was arrested, taken to the Franklin County Sheriff's Department and held over night. He had an opportunity to sleep and when Det. Grellner came to question him the next day he was responsive and alert. Det. Grellner advised him of his <u>Miranda</u> rights as more fully set out in the Findings of Fact above.

A defendant may knowingly and intelligently waive his rights and agree to answer questions. <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver of the <u>Miranda</u> rights by the defendant. <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986). "The requirement that <u>Miranda</u> warnings be given does not, of course, dispense with the voluntariness inquiry" <u>Dickerson v. United States</u>, 530 U.S. 428, 444 (2000). The court must look to the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception; and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. <u>Moran v. Burbine</u>, 475 U.S. 412 (1986).

The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. <u>Haynes v. Washington</u>, 373 U.S. 503 (1963); <u>Colorado v. Connelly,</u> 479 U.S. at 170. However, as the Supreme Court stated in <u>Berkemer v. McCarthy</u>, 468 U.S. 420 (1984), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of <u>Miranda</u> are rare." <u>Id.</u> at 433 n. 20; <u>Dickerson</u>, 530 U.S. at 444.

There is no evidence that defendant's statements were anything other than voluntary. There is no evidence of intimidation, coercion or deception. Defendant said he understood his rights and voluntarily waived them. This is definitely not one of the "rare" cases referred to in <u>Berkemer</u>. These statements should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the government's Motion for Pretrial Determination of the Admissibility of Defendant's Statements Pursuant to Title 18 United States Code § 3501 be **GRANTED** and that the statements be admitted. [Doc. 27]

**IT IS FURTHER RECOMMENDED** that defendant's Motion to Suppress the Indictment be **DENIED**. [Doc. 134]

**IT IS FURTHER RECOMMENDED** that defendant's Motion to Suppress Evidence and Statements be **DENIED**. [Doc. 135]

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this   16th   day of May, 2005.